UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| FRED M., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:20-cv-00784-TWP-DLP |
| | ) |
| KILOLO KIJAKAZI, Acting Commissioner of the | ) |
| Social Security Administration,[1] | ) |
| | ) |
| Defendant. | ) |

**ENTRY ON JUDICIAL REVIEW**

Plaintiff Fred M.[2] requests judicial review of the final decision of the Commissioner of the Social Security Administration (the "SSA"), denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act. For the following reasons, the Court **remands** the decision of the Commissioner.

**I.   PROCEDURAL BACKGROUND**

On November 10, 2016, Fred M. protectively filed an application for DIB, alleging a disability onset date of October 1, 2014. (Filing No. 10-2 at 16.) His application was initially denied on January 23, 2017, (Filing No. 10-4 at 4), and upon reconsideration on June 27, 2017, (Filing No. 10-4 at 14). Administrative Law Judge Elias Xenos (the "ALJ") conducted a hearing on November 5, 2018, at which Fred M., represented by counsel, and a vocational expert ("VE"),

---

[1] According to Federal Rule of Civil Procedure 25(d), after the removal of Andrew M. Saul from his office as Commissioner of the SSA on July 9, 2021, Kilolo Kijakazi automatically became the Defendant in this case when she was named as the Acting Commissioner of the SSA.

[2] To protect the privacy interests of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

appeared and testified. (Filing No. 10-2 at 33-61.) The ALJ issued a decision on January 30, 2019, concluding that Fred M. was not entitled to receive benefits. (Filing No. 10-2 at 13-23.) The Appeals Council denied review on January 13, 2020. (Filing No. 10-2 at 2.) On March 11, 2020, Fred M. timely filed this civil action, asking the Court pursuant to 42 U.S.C. § 405(g) to review the final decision of the Commissioner denying him benefits. (Filing No. 1.)

## II. STANDARD OF REVIEW

"The Social Security Administration (SSA) provides benefits to individuals who cannot obtain work because of a physical or mental disability." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1151 (2019). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018). To be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work but any other kind of gainful employment which exists in the national economy, considering his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

The Commissioner employs a five-step sequential analysis to determine whether a claimant is disabled. At step one, if the claimant is engaged in substantial gainful activity, he is not disabled despite his medical condition and other factors. 20 C.F.R. § 404.1520(a)(4)(i). At step two, if the claimant does not have a "severe" impairment that also meets the durational requirement, he is not disabled. 20 C.F.R. § 404.1520(a)(4)(ii). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of

impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant's impairments do not meet or medically equal one of the impairments on the Listing of Impairments, then his residual functional capacity will be assessed and used for the fourth and fifth steps. *See* 20 C.F.R. § 404.1520(a)(4)(iv)-(v). Residual functional capacity ("RFC") is the "maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); Social Security Ruling ("SSR") 96-8p (S.S.A. July 2, 1996), 1996 WL 374184). At step four, if the claimant can perform his past relevant work, he is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). At the fifth and final step, it must be determined whether the claimant can perform any other work, given his RFC and considering his age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v). The claimant is not disabled if she can perform any other work in the relevant economy. *Id*.

The combined effect of all the impairments of the claimant shall be considered throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner for the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

When an applicant appeals an adverse benefits decision, this Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision. *Stephens*, 888 F.3d at 327. For the purpose of judicial review, "substantial evidence" is such relevant "evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020) (quoting *Biestek*, 139 S. Ct. at

1154). "Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled." *Stephens*, 888 F.3d at 327. Reviewing courts also "do not decide questions of credibility, deferring instead to the ALJ's conclusions unless 'patently wrong.'" *Zoch*, 981 F.3d at 601 (quoting *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017)). The Court does "determine whether the ALJ built an 'accurate and logical bridge' between the evidence and the conclusion." *Peeters v. Saul*, 975 F.3d 639, 641 (7th Cir. 2020) (quoting *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014)).

If an ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the court must affirm the denial of benefits. *Stephens*, 888 F.3d at 327. When an ALJ's decision does not apply the correct legal standard, a remand for further proceedings is usually the appropriate remedy. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021). Typically, a remand is also appropriate when the decision is not supported by substantial evidence. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005). "An award of benefits is appropriate only where all factual issues have been resolved and the 'record can yield but one supportable conclusion.'" *Id*. (quoting *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993)).

### III.   FACTUAL BACKGROUND

When Fred M. filed, he alleged that he could no longer work because of sciatica, an S1 fracture, spondylosis, type 2 diabetes, osteoarthritis of the right knee, hypertension, recurrent MRSA, gout, and morbid obesity. (Filing No. 10-6 at 25.) He was 49 years old when his alleged disability began. (*See* Filing No. 10-4 at 4.) He has earned a GED. (Filing No. 10-6 at 26.) He has done factory work as an assembler, forklift operator, laborer, and process technician. (Filing No. 10-6 at 27.) The relevant evidence of record is amply set forth in the parties' briefs, as well as

the ALJ's decision and need not be repeated here.  Specific facts relevant to the Court's disposition of this case are discussed below.

The ALJ followed the five-step sequential evaluation set forth by the SSA in 20 C.F.R. § 404.1520(a)(4) and concluded that Fred M. was not disabled.  (Filing No. 10-2 at 23.)  At step one, the ALJ found that Fred M. had not engaged in substantial gainful activity[3] since October 1, 2014, the alleged onset date.  (Filing No. 10-2 at 18.)  At step two, the ALJ found that Fred M. had "the following severe impairments: [r]adiculopathy in the lumbar spine, [l]umbar spondylosis, [l]umbar spondylolisthesis, [l]umbar degenerative disc disease, [l]eft-sided sciatica, [s]tatus post right [knee] arthroscopic surgery, [s]tatus post right rotator cuff tear and surgical repair, [l]eft knee arthritis, and [d]iabetes mellitus."  (Filing No. 10-2 at 18-19 (citation omitted).)  At step three, the ALJ found that Fred M. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (Filing No. 10-2 at 19.)  After step three but before step four, the ALJ concluded:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: [o]ccasionally climbing ramps; [n]ever climbing stairs, ladders, ropes or scaffolds; [o]ccasionally stooping and crouching; [n]ever balancing, crawling, or kneeling; [f]requently reaching in all directions with the right upper extremity but never overhead; [f]requently handling, fingering, and feeling with the right upper extremity; [n]ever foot controls bilaterally; [m]ay never work around unprotected heights or hazardous machinery; [n]ever concentrated exposure to extreme heat, extreme cold, wetness, or vibration; and [m]ust be permitted to alternate between sitting and standing every 15 minutes.

(Filing No. 10-2 at 19-20.)  At step four, the ALJ found, considering the VE's testimony and Fred M.'s RFC, that he could not perform his past relevant work as a furniture assembler or maintenance

---

[3] Substantial gainful activity is defined as work activity that is both substantial (*i.e*., involves significant physical or mental activities) and gainful (*i.e*., work that is usually done for pay or profit, whether or not a profit is realized).  20 C.F.R. § 404.1572(a).

5

mechanic, but he could perform his past relevant work as a production assembler as it is generally performed in the economy. (Filing No. 10-2 at 22-23.)

## IV. DISCUSSION

Fred M. makes two assertions—arguing that the ALJ erroneously: (1) evaluated his subjective statements concerning his symptoms, (Filing No. 13 at 22-29); and (2) provided only a perfunctory explanation that his impairments did not meet or equal Listing 1.04, (Filing No. 13 at 29-34). The Court will address the arguments in reverse order as necessary to resolve the appeal.

### A. Listings 1.04

To meet a listing, a claimant must establish with objective medical evidence the precise criteria that is specified. *See* 20 C.F.R. § 404.1525; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) ("The applicant must satisfy all of the criteria in the Listing in order to receive an award of" benefits at Step Three). Alternatively, a claimant can establish "medical equivalence" in the absence of one or more of the findings if he has other findings related to the impairment or has a combination of impairments that "are at least of equal medical significance." *See* 20 C.F.R. § 404.1526(a)-(b). In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing. *See Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003); *Scott v. Barnhart*, 297 F.3d 589, 595-96 (7th Cir. 2003). For example, in *Minnick v. Colvin,* 775 F.3d 929, 935-36 (7th Cir. 2015), the Seventh Circuit found the ALJ's perfunctory analysis to warrant remand when it was coupled with significant evidence of record that arguably supported the listing. *See Kastner v. Astrue*, 697 F.3d 642, 647-48 (7th Cir. 2012) (remanding where the ALJ's cursory listing analysis failed to articulate a rationale for denying benefits when the record supported finding in the claimant's favor). To demonstrate that

an ALJ's listing conclusion was not supported by substantial evidence, the claimant must identify evidence of record that was misstated or ignored that met or equaled the criteria. *See*, *e.g.*, *Sims v. Barnhart*, 309 F.3d 424, 429-30 (7th Cir. 2002).

The regulations explain that the diagnostic criteria of Listing "1.04 *Disorders of the Spine*" is satisfied by a condition that causes "associated impingement on nerve roots (including the cauda equina) or [the] spinal cord." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 1.00(K). To establish the alternative criteria of Listing 1.04(A) specifically, the regulations require "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." *Id*. at 1.04(A).

The ALJ addressed Listing 1.04. ([Filing No. 10-2 at 19](#).) The entirety of the ALJ's analysis in the section dedicated to step three is as follows:

> The severity of the claimant's back disorder does not meet the listing in section 1.04 because the evidence of record does not demonstrate nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication as required under this listing. Regarding the effects of spine impairment on the claimant's upper and lower extremities, the medical evidence of record does not demonstrate difficulty ambulating as defined in l.00(B)(2)(b) or an inability to perform fine and gross movements effectively as defined in l.00(B)(2)(c).

([Filing No. 10-2 at 19](#).) The first sentence references the alternative diagnostic criteria of Listing 1.04: A, B, and C. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 1.04. The second sentence references listing requirements that do not apply to Listing 1.04(A). *Id*. at 1.04(A).

However, an MRI of Fred M.'s lumbar spine, taken March 3, 2016, showed:

> L5-S1: Mild anterior spondylotic change. Focal left foraminal disc herniation/extrusion with craniad extension measur[ing] approximate[ly] 13.5mm transverse x 8mm AP x 12mm craniocaudal[l] dimensions and results in severe left foraminal stenosis with compression of the left exiting L5 nerve root and is likely

7

>a major contributing factor to the patient's left-sided radiculopathic syndrome. Underlying broad-based spondylotic disc bulge with right foraminal endplate spurring and facet degenerative change with moderate right foraminal stenosis and abutment of the right exiting L5 nerve root within the neural foramen.

(Filing No. 10-7 at 62.)  The imaging demonstrates the diagnostic criteria of Listing 1.04(A) and correlates with a neuroanatomic distribution of pain according to the radiologist's interpretation. As such, the ALJ's conclusory analysis in the section dedicated to step three is inaccurate concerning Listing 1.04(A).

The record also demonstrates the remaining requirements of Listing 1.04(A).  For examples of each of the requirements, on February 15, 2016, lumbar range of motion was "very restricted, with pain and spasm." (Filing No. 10-7 at 8.) During a consultative examination on January 18, 2017, Fred M. had decreased lumbar forward flexion and extension. (Filing No. 10-8 at 79.) On March 16, 2016, his muscle strength in the left ankle and foot was decreased at 4/5 relative to 5/5 strength otherwise in his other extremities. (Filing No. 10-7 at 21.) During the consultative examination, muscle strength was 4/5 in both hips and knees. (Filing No. 10-8 at 78.) On February 29, 2016, Fred M.'s "left Achilles reflex [was] depressed relative to the right." (Filing No. 10-7 at 29.) During the consultative examination, he had absent knee reflexes. (Filing No. 10-8 at 78.) While either reflex or sensation deficiencies will satisfy that one particular requirement of the listing, on July 18, 2010, there was also evidence of the latter with a "tactile decrease [to sensation in the right] distal extremities." (Filing No. 10-11 at 48.)

The ALJ's RFC analysis explained in relative part that "[a]lthough [Fred M.] had some abnormalities on examinations, such as antalgic gate, pain, spasm, bilateral tenderness in his sciatic notch, and restricted range of motion, he has also typically been found with no significant lumbar tenderness to palpation and negative straight leg raises." (Filing No. 10-2 at 21 (citations omitted).) The last conclusion is relevant to Listing 1.04(A).  A positive straight-leg raising test, both sitting

8

and supine, is the final requirement of the listing when, as here, the nerve compression involved the lumbar spine. However, the ALJ's characterization of the record ignores the relevant, supportive evidence. Numerous examinations performed by multiple providers, including the consultative examiner and a treating orthopedic surgeon, have recorded positive straight-leg raising tests on the left, right, and bilaterally. (Filing No. 10-7 at 29 (February 29, 2016); Filing No. 10-7 at 25 (March 8, 2016); Filing No. 10-7 at 44 (March 10, 2016); Filing No. 10-7 at 21 (March 16, 2016); Filing No. 10-8 at 163 (April 13, 2017); Filing No. 10-9 at 184 (May 31, 2017); Filing No. 10-11 at 48 (July 10, 2018); Filing No. 10-11 at 44 (July 17, 2018); Filing No. 12-1 at 10 (August 8, 2018).)

The Court notes that the record did show that Fred M.'s relevant symptoms and clinical findings improved with surgery. On September 11, 2018, he underwent a single-level lumbar fusion of L5-S1. (Filing No. 12-1 at 58.) At the only follow-up in the record with his treating orthopedic surgeon, Hon Quynh Vien, D.O., on September 26, 2018, Fred M. reported that his pain had "improved significantly." (Filing No. 12-1 at 68.) Straight-leg raising tests were then negative bilaterally. (Filing No. 12-1 at 68.) An x-ray showed that "spondylolisthesis," slippage of the position of one vertebra relative to another, had "been somewhat reduced," and the "pars defect," the vertebral fracture that caused the misalignment, had "stabilized," without any "sign of complication." (Filing No. 12-1 at 69); *see* Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/10303-spondylolysis (last visited July 26, 2021). During the hearing on November 5, 2018, Fred M. testified that he had no longer experienced numbness in his legs and tingling in his toes since the moment that he woken up from surgery. (Filing No. 10-2 at 45.)

9

However, a claimant is entitled to a period of disability so long as he satisfies the definition of disability for a continuous period of not less than twelve months, and he has filed an application within the appropriate timeframe relative to that period. 20 C.F.R. §§ 404.315, 404.316, and 404.1505. A "closed period" is a finite period that started and ended before the date of the disability decision. *See, e.g.*, *Pickett v. Bowen*, 833 F.2d 288, 289 n.1 (11th Cir. 1987). The Seventh Circuit has explained that "[b]efore limiting benefits to a closed period, an ALJ must conclude either that a claimant experienced 'medical improvement' as evidenced by changes in the symptoms, signs, or test results associated with [his] impairments, or else that an exception to this rule applies." *Tumminaro v. Astrue*, 671 F.3d 629, 633 (7th Cir. 2011) (quoting 20 C.F.R. § 404.1594(a), (b)(1)) (other citations omitted). A reviewing court may find reversable error if the ALJ did not separately consider the evidence relevant to a potential closed period that was distinctly different than the evidence of current functioning. *Brown v. Massanari*, 167 F. Supp. 2d 1015, 1020-21 (N.D. Ill. 2001). There was a considerable period from around the beginning of 2016 through the September 2018 back surgery when Fred M. arguably met Listing 1.04(A). At a minimum, the record was more supportive of listing-level severity than the ALJ explicitly recognized.

Accordingly, remand for further consideration of Listing 1.04(A) is necessary.

**B.** **Subjective Symptom Evaluation**

Fred M. also challenges the ALJ's subjective symptom evaluation. When evaluating a claimant's subjective statements about the intensity and persistence of her symptoms, the ALJ must often, as here, make a credibility determination concerning the limiting effects of those symptoms. *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). Reviewing courts "may disturb the ALJ's credibility finding only if it is 'patently wrong.'" *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th

Cir. 2019) (quoting *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015)). Reviewing courts examine whether a credibility determination was reasoned and supported, only when an ALJ's decision "lacks any explanation or support . . . will [a court] declare it to be 'patently wrong.'" *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). "Credibility determinations will not be overturned unless they are clearly incorrect. As long as the ALJ's decision is supported by substantial and convincing evidence, it deserves this court's deference." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citations omitted); *see Alvarado v. Colvin*, 836 F.3d 744, 749 (7th Cir. 2016) (a credibility determination "tied to evidence in the record" may not be disturbed as patently wrong.). If a fully favorable determination cannot be made based solely on the objective medical evidence, SSR 16-3p directs the ALJ to consider "all of the evidence to evaluate the intensity, persistence, and limiting effects of an individual's symptoms," including the regulatory factors relevant to a claimant's symptoms, such as daily activities, the location, duration, frequency, and intensity of pain or other symptoms, factors that precipitate and aggravate the symptoms, the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; and treatment, other than medication, an individual receives or has received for relief of pain or other symptoms. SSR 16-3p (S.S.A Oct. 25, 2017), 2017 WL 5180304, at *6-8; 20 C.F.R. § 404.1529(c)(3).

Specifically, Fred M. contends that the ALJ's rationales for his adverse credibility finding that he (1) showed significant improvement with conservative care including injections and physical therapy, and (2) was able to care for his grandchildren, were "both erroneous and unfounded." (Filing No. 13 at 24.)

The ALJ explained that "[a]s for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because the claimant showed

11

significant improvement with conservative care including injections and physical therapy. Furthermore, the claimant cares for his grandchildren (9E/l-2; 2F/3)." The ALJ's conclusion that Fred M.'s condition improved with conservative care is belied by the fact that he needed to have lumbar fusion surgery. The ALJ explained that he "reported pain alleviation with anti-inflammatories and pain medication (2F/13)." (Filing No. 10-2 at 21.) However, the cited record notes that Fred M.'s "pain [was] exacerbated by standing and mildly alleviated by anti-inflammatories and pain medications." (Filing No. 10-7 at 24.) Regardless, the ALJ also explained that Fred M. reported significant improvement with his pain after the lumbar fusion. (Filing No. 10-2 at 21.) As explained above, the timing of that surgical improvement relative to the period at issue needs further consideration generally.

So too does the ALJ's subjective symptom evaluation, because the ALJ's remaining justification is problematic according to the Seventh Circuit. Fred M. testified that he lived with his wife and four grandchildren. (Filing No. 10-2 at 35.) He explained that he and his wife had been the primary caregivers for his grandchildren for "[g]oing on five years," after they were given legal guardianship because the mother had "some drug issues." (Filing No. 10-2 at 35-36.) In *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (citations omitted) (emphasis in original), the Seventh Circuit explained:

> The administrative law judge's casual equating of household work to work in the labor market cannot stand. Gentle *must* take care of her children, or else abandon them to foster care or perhaps her sister, and the choice may impel her to heroic efforts. A person can be totally disabled for purposes of entitlement to social security benefits even if, because of an indulgent employer or circumstances of desperation, he is in fact working.
> [. . .]
> A more important point is that taking care of an infant, although demanding, has a degree of flexibility that work in the workplace does not. You can park the infant in a playpen for much of the day, and anyway it will sleep much of the day . . . and so the caretaker will have numerous breaks in which to rest.

As cited by the ALJ, the medical record contained a statement that Fred M. "no longer works as he is staying home to take care of his 4 grandchildren who he has custody of." ([Filing No. 10-7 at 14](#).) He also filed out a form for the SSA describing his daily activities including getting the two oldest children ready for school, taking care of the two youngest children during the day, walking outside if the weather was okay, and watching the children in the evening. ([Filing No. 10-6 at 63](#).) However, the form appears to indicate that his wife worked second shift and was home during the day. (*See* [Filing No. 10-6 at 63](#).) He also listed his "wife" and "kids" as being able to care "for other people or animals," and noted that he could no longer walk long distances. ([Filing No. 10-6 at 64](#).) The specifics of the childcare—including his ability to take breaks or his wife's availability to help—were unexplored during the hearing.

The Commissioner contends that the ALJ also considered Fred M.'s reported ability to independently care for his own needs and activities of daily living other than heavy activities such as weed whacking. ([Filing No. 19 at 20-21](#).) However, the Court does not see those rationales reflected in the decision. "Under the Chenery doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace." *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.") (additional citations omitted)). Other than conclusory and undeveloped use of Fred M.'s necessary childcare, the ALJ did not explain that activities of daily living were a factor used generally to discredit his allegations, let alone explain how specific activities were inconsistent with those allegations.

The Commissioner also contends that the ALJ's RFC finding was consistent with Fred M.'s own testimony that he could have worked an eight-hour day if he could alternative back and forth

between sitting and standing every 15 minutes. (Filing No. 19 at 20.) Fred M. did testify "[y]eah," that he could perform an eight-hour shift if he could get up every 15 minutes from sitting, "stretch out a little bit," and "go back and sit down and continued the work." (Filing No. 10-2 at 52.) He later added that he'd "give it a shot." (Filing No. 10-2 at 52.) The ALJ noted that Fred M. had "testified he could stand for 15 minutes and sit for 15 minutes." (Filing No. 10-2 at 20.)

However, the ALJ noted that "[h]e also testified he could lift 20 pounds." (Filing No. 10-2 at 20.) He testified that he wouldn't have been able "to lift heavy things. But like I said, at the time, I was willing to try something." (Filing No. 10-2 at 42.) The ALJ asked, "What about today? Do you think you can lift, say, a part that weighs -- let's say 20 pounds? Would that give you trouble?" (Filing No. 10-2 at 42.) Fred M. responded, "At this point, I'm on restriction. I'm not supposed to lift over 10." (Filing No. 10-2 at 42.) On September 5, 2018, at the visit with Dr. Vien immediately before his lumbar surgery, he "was advised of post-operative BLT restrictions (no bending, twisting or lifting greater than 10 pounds) and continued brace wear as advised following the procedure." (Filing No. 12-1 at 42.) Despite noted improvement after surgery, at the only follow-up visit in the record with the orthopedic provider, on September 26, 2018, Fred M. was advised that "[h]e should continue BLT restrictions and brace wear." (Filing No. 12-1 at 69.) As the record ended, there was no indication that Fred M. had been released to lift and carry greater weights.

Fred M.'s counsel also asked him during the hearing, "How about a case of Coke, Pepsi, Sprite – whatever you brand may be – one of the 24 packs. Those are about 18 pounds, or so. Could you lift one of those, prior to the surgery?" (Filing No. 10-2 at 53.) He replied, "No." (Filing No. 10-2 at 53.) Fred M.'s testimony, as a whole, was inconsistent with him being able to

perform the RFC assigned by the ALJ or his past relevant work, either as actually or generally performed.

Accordingly, further consideration of Fred M.'s subjective statements consistent with this entry is needed on remand.

## V.     CONCLUSION

For the reasons stated above, the final decision of the Commissioner is **REMANDED** for further proceedings consistent with this Entry as authorized by Sentence Four of 42 U.S.C. § 405(g).

**SO ORDERED.**

Date:  8/16/2021

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Kirsten Elaine Wold
HANKEY LAW OFFICE
kew@hankeylaw.com

Julian Clifford Wierenga
UNITED STATES ATTORNEY'S OFFICE
julian.wierenga@usdoj.gov

Lindsay Beyer Payne
SOCIAL SECURITY ADMINISTRATION
lindsay.payne@ssa.gov